UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
RAHAMAN KHAN,                                               :
                                                            :
                            Plaintiff,                      :   **MEMORANDUM OF DECISION**
                                                            :
            - against -                                     :
                                                            :   1:04-cv-762-ENV-SMG
IBI ARMORED SERVICES, INC.,                                 :
                                                            :
                            Defendant.                      :
                                                            :
------------------------------------------------------------X

VITALIANO, D.J.

    Rahaman Khan ("Khan"), formerly an employee of defendant IBI Armored Services, Inc. ("IBI"), has brought suit for unpaid overtime wages. His claim was tried before the Court sitting without a jury. Having heard and observed the testimony of the witnesses, reviewed the photographic and documentary exhibits received in evidence, and considered the arguments of counsel, this Memorandum of Decision, pursuant to Federal Rule of Civil Procedure 52, constitutes the Court's findings of fact and conclusions of law.

    Khan's claim arises under the Fair Labor Standards Act of 1938 ("FLSA"), 52 Stat. 1060, *as amended*, 29 U.S.C. § 201 et seq., and this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Khan asserts a parallel and ancillary claim under the New York Minimum Wage Act, N.Y. Lab. Law § 650 et seq.,[1] over which this Court has jurisdiction pursuant to 28 U.S.C. §

---

[1] Khan's state law claim is, in this case, subsumed by his federal claim. New York's overtime law incorporates most of the FLSA's substantive provisions and exemptions, see N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.2, and a court's analysis under federal and state law will, in this and most cases, be the same. See Zheng v. Liberty Apparel Co., 355 F.3d 61, 78 (2d Cir. 2003); Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003). Although state and federal law differ with regard to liquidated damages, see Bauin v. Feinberg, 6 Misc. 3d 1038(a), 800 N.Y.S.2d 342 (Table), 2005 WL 636700, at *4-6 (Civ. Ct. N.Y. County Mar. 18,

1367.

The dispute between the parties is intense but has a pencil thin focus. With little and insignificant exception, the essential facts are not in dispute. The parties agree that Khan worked for IBI; that IBI was engaged in interstate commerce; that from time to time, Khan worked more than 40 hours per week; and that, when he did so, Khan was not paid at an hourly overtime rate. The parties even agree on the number of hours of uncompensated overtime work performed by Khan and that, applying the time and a half standard, Khan would have been entitled to $7,744.25 in overtime pay, if his duties were covered under the FLSA. In fact, all that was tried to the Court was defendant's affirmative defense that Khan was not entitled to overtime pay at all because the work Khan performed for IBI was exempt from the overtime compensation provisions of the FLSA under the Motor Carrier Exemption provision of that Act ("Motor Carrier Exemption"), § 13(b)(1), 29 U.S.C. § 213(b)(1).

## THE MOTOR CARRIER EXEMPTION

Under the FLSA, an employee engaged in interstate commerce must be paid at least time and a half his ordinary wage for each hour worked in excess of 40 hours per week. 29 U.S.C. § 207(a).[2] The Act's legislative history suggests three overlapping purposes of the overtime provision: (i) to prevent workers who are willing to work abnormally long hours from taking the jobs of others who are not so willing; (ii) to "spread the work" by giving employers an incentive to hire more employees rather than to overwork an existing group of employees; and (iii) to

---

2005), the difference is irrelevant here since, to the extent they differ, Khan has elected to forego that aspect of his state claim. Pl.'s Post-Trial Mem. at 1 n.1.

[2] The time and a half standard is subject to a list of exemptions. See 29 U.S.C. § 213.

protect workers from the dangers of oppressive working hours. Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48, 63 S.Ct. 917, 87 L.Ed. 1244 (1943); Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1175-76 (7th Cir. 1987); Freeman v. Nat'l Broad. Co., 846 F. Supp. 1109, 1112 (S.D.N.Y. 1993), *rev'd on other grounds*, 80 F.3d 78 (2d Cir. 1996). "The requirement of such increased pay is a remedial measure adapted to the needs of an economic and social program rather than a police regulation adapted to the rigid enforcement required in a safety program." Levinson v. Spector Motor Serv., 330 U.S. 649, 657, 67 S.Ct. 931, 91 L.Ed. 1158 (1947).

Prior to the FLSA, Congress had enacted the Motor Carrier Act ("MCA") of 1935, Pub. L. No. 74-255, 49 Stat. 543 (now codified as amended in scattered sections of 49 U.S.C.). The MCA's purpose was to promote efficiency, economy, and safety in interstate motor transport. Southland Gasoline Co., 319 U.S. at 48; Masson v. Ecolab, Inc., No. 04-cv-4488, 2005 WL 2000133, at *5 (S.D.N.Y. Aug. 17, 2005). As such, it gave the Interstate Commerce Commission ("ICC") – and now, the Department of Transportation – authority to regulate the trucking industry, as it had previously regulated the rail industry. M. Fortunoff of Westbury Corp. v. Peerless Ins. Co., 432 F.3d 127, 130 (2d Cir. 2005). Among the powers delegated to the ICC was the power to regulate the maximum hours of "common carriers" and "contract carriers." Masson, 2005 WL 2000133, at *5. In its current form, the MCA allows the Secretary of Transportation to "prescribe requirements for qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2).

Recognizing that it had already delegated authority to the ICC with regard to motor carrier employees, Congress specifically exempted these employees from coverage under the overtime provision of the FLSA. Precisely, the FLSA exempts "any employee with respect to whom the Secretary of Transportation *has power* to establish qualifications and maximum hours of service pursuant to" the MCA, 49 U.S.C. § 31502. 29 U.S.C. § 213(b)(1) (emphasis added). As this statutory exemption's language makes clear, it matters not whether the Secretary of Transportation has actually *exercised authority* by promulgating regulations; instead the exemption applies wherever the Secretary *has authority* to do so. See Southland Gas. Co., 319 U.S. at 47-48; Martin v. Coyne Int'l Enters., Corp., 966 F.2d 61, 63 (2d Cir. 1992). The exemption was adopted so as to avoid any problems that might arise if two government agencies had overlapping jurisdiction. Southland Gasoline Co., 319 U.S. at 48-49; Masson, 2005 WL 2000133, at *5.

In Levinson, the Supreme Court addressed a finding of the ICC that truck "loaders" fell within the ambit of its authority under the MCA; a result that would categorically exempt these employees from the overtime pay provision of the FLSA. The ICC had found as follows:

> The large carriers, . . . particularly those who have important operations from terminal to terminal, employ men variously called loaders, dockmen, or helpers, and hereinafter called loaders, whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse.
>
> The evidence makes it entirely clear that a motor vehicle must be properly loaded to be safely operated on the highways of the country. If more weight is placed on one side of the vehicle than on the other, there is a tendency to tip when rounding curves. If more weight is placed in the rear of the vehicle, the tendency is to raise the front wheels and make safe operation difficult. Further, it is necessary that

4

> the load be distributed properly over the axles of the motor vehicle.
>
> Proper loading is not only necessary when heavy machinery, steel, and other like commodities are being transported, but is of importance when normal package freight is handled. If several packing cases weighing from 150 to 200 pounds are loaded on one side of a motor vehicle or at one end thereof, and lighter freight on the other side or at the other end, safe operation is difficult. The great majority, if not all, of the carriers whose operations are of sufficient size or character to justify the employment of loaders handle freight of such weight that proper loading is necessary.

Levinson, 330 U.S. at 652 n.2. The Court upheld the ICC's finding that "loaders" fall within its authority, at least where "a substantial part of [the loader's] activities affect[] the safety of interstate motor carrier operations." Id. at 668. Levinson instructs that, in determining the scope of the Motor Carrier Exemption, "[t]he fundamental test is simply that the employee's activities affect safety of operation." Id. at 671.

In the companion case to Levinson, the Supreme Court made clear, however, that it had not granted the ICC unlimited power to regulate anyone whom it deems a "loader." The Court explained that

> the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of "loading" which is described by the Commission and which, in its opinion, affects safety of operation.

Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 708, 67 S.Ct. 954, 91 L.Ed. 1184 (1947).[3]

---

[3] In Levinson, the ICC advanced the position that it had authority to regulate loaders because of their relation to highway safety, but in the 60 years since that case, neither the ICC nor Department of Transportation has seen fit to exercise its authority under the MCA. The passage of the MCA in 1935 recognized the special nature of employees whose job performance affect highway safety, and as such, recognized that there might be a need to limit

5

Therefore, although a court must accept the ICC's general findings regarding loading and safety, Pyramid instructs lower courts to inquire into both the general character and extent of an individual employee's duties in determining whether those duties bring the employee within the jurisdiction of the regulator, now the Department of Transportation. Troutt v. Stavola Bros., Inc., 107 F.3d 1104, 1109-10 (4th Cir. 1997).

IBI, bluntly, relies on a statutory excuse to stave off Khan's overtime claim. Accordingly, IBI has the burden to prove its affirmative defense that Kahn's job responsibilities fall within an FLSA exemption. See Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 222 (2d Cir. 2002); Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 196-97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). In this regard, the Court is mindful that exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Bilyou, 300 F.3d at 222 (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)).

## FINDINGS OF FACT

IBI is an armored transportation company which provides a full range of secure shipment and storage services throughout North America. Those services include the secure movement of

---

those workers' hours. Obviously, a tired and overworked truck-driver presents a public danger. To the extent that Congress expressed such a policy preference in passing the MCA, this Court notes the perverse nature of this dispute. If this Court finds that Khan's duties affect highway safety, then his hours will not be subject to any regulation at all – not even the limited remedial overtime regulation of the FLSA that applies to all other non-exempt workers. The Supreme Court recognized this point over 60 years ago when it stated that "[i]t would seem that if the point now urged had been in the mind of Congress it would have itself expressed the intention to leave private carriers subject to the Fair Labor Standards Act until the Commission took action." Southland Gasoline Co., 319 U.S. at 49. Yet, Congress has never taken action to rectify the apparent inconsistency between statutory purpose and statutory effect.

coin, currency, precious metals, credit cards, and other valuables for a variety of retail commercial accounts and banks, including the Federal Reserve. (Tr. 29, 36.)[4] There is no question that the business of IBI is essentially interstate in nature. Indeed, it is stipulated that Khan's claim for overtime arises out of work he performed for IBI as it was engaged in interstate commerce. (Tr. 10.)

Khan was on IBI's payroll from May 2001 to August 2003 and was assigned to IBI's facility at 37-06 61st Street in Woodside, Queens. (Tr. 21, 89, 91.) The Woodside depot is a highly secure facility. It has a vault, restricted access areas, various interlocking doors, and surveillance monitoring. (Def.'s Exh. 1.) It serves as a hub for IBI's New York metropolitan operations – a storage and shipment center from which route trucks service nearby retail stores and banks and airport trucks service customers with more distant cargo destinations. (Tr. 29-30, 93.)

The movement of cargo into and out of the Woodside facility is tightly choreographed. The trucks enter through a set of secure doors and then dock in a bay area. (Tr. 23-24.) A glass door that separates the bay area from the vault area will not be opened until the exterior bay door is closed. (Tr. 34.) As a matter of IBI policy, truck crews are restricted from entering the vault area. (Tr. 10.) Vault employees, on the other hand, have access to the bay area but, pursuant to the same policy, are not ordinarily allowed to board trucks. (Tr. 10.) Regardless the classification of the employee performing the duty, the exchange of cargo takes place where the bay area meets the vault area. (Tr. 34.)

---

[4] Citations to "Tr." refer to the transcript of the trial held before this Court on August 28, 2006.

During the entire time he was employed by IBI, Khan was employed as a vault attendant who worked the 3 p.m. to midnight shift each week at the Woodside depot. At trial, Khan explained in great detail the responsibilities and duties of his job. This testimony is largely undisputed. In fact, Khan's testimony was actually corroborated, either directly or by inference, by two of IBI's own witnesses: Willie Mendez, a vault supervisor who had worked with Khan from time to time, (Tr. 90-91), and Elaine Trefzer, IBI's vice president of currency operations. (Tr. 128.)

On an average workday, the Court finds, Khan would begin his shift by conferring with colleagues departing from the prior shift regarding the just completed and anticipated movement of shipments and then by physically preparing the vault area to meet the requirements for these anticipated shipments and storage of cargo. (Tr. 21-22.) The next order of business would be Khan's participation in the off-loading of the first route truck making its return to the depot with cargo – usually bags of cash and currency picked up during the day from retail commercial establishments or banks along the truck's assigned route. (Tr. 22-23.)

For the off-loading procedure, Khan was stationed behind a counter in the area where the truck crews would check-in upon arrival. (Tr. 26.) The truck crew would hand Khan a handheld portable computer, called a "Dolphin," which produces a readout of each item of cargo carried by the route truck. (Tr. 17-18, 27.) Khan would then display the Dolphin's computerized cargo manifest on a video terminal. (Tr. 27-28, 92.) The next step was for the truck crew to offload each cargo bag from the truck, place the cargo in bins, wheel the bins into the check-in room, remove the cargo from the bins, and then pass each item over the counter to Khan. (Tr. 25-26,

8

62.) Khan would scan the bar-coded bags with the Dolphin in order to account for each item on the cargo manifest. (Tr. 29.) As Khan took his one-bag-at-a-time inventory, he placed each checked-in bag in a bin for further processing by vault personnel assigned to the "money room." (Tr. 31-32.) Nine route trucks a day were handled by Khan in this fashion. (Tr. 32.) He spent about 75% of a normal shift's working time in duties relating to this type of off-loading procedure. (Tr. 81.) In a similar way, Khan assisted in the off-loading of airport trucks that might arrive with their cargo, (Tr. 44.), and critical to the issues here, Khan also spent some time on an ordinary shift preparing cargo for shipment. (Id.)

There is little dispute on this last score, the preparation of cargo for shipment, either. Money room personnel directed the process of designating such items. They did so by uploading the outgoing cargo manifest onto the Dolphin, (Tr. 45-46.), and placing most of the outbound cargo into wheeled trolleys or bins. (Tr. 56.) The following morning, during a shift different from the one that Khan worked, the route truck crew would use the Dolphin to insure that the proper cargo had been loaded. (Tr. 46.) As part of the necessary preparations for outgoing shipments, Khan followed the money room's direction to place any remaining items of outbound cargo – currency, coins, credit cards, and precious metals – into the appropriate bin or trolley and, for heavier items, his supervisor determined the appropriate pallet or skid where such cargo was placed so that all were ready for ultimate loading on the route trucks. (Tr. 47-49, 75-76.) For example, Khan acknowledged that he had, as part of his regular duties, loaded heavy gold bars onto a steel trolley. (Tr. 47.) He also physically placed heavy money bags onto skids and, when required, moved the skids from the vault area to the bay area with the assistance of a pump

9

jack. (Tr. 59, 67.) Khan admitted that he determined the way in which cargo was placed in the bins and on the trolleys and skids. (Tr. 76.) After gaining experience, he also determined when and how to use "shrink wrap"[5] to stabilize pallet loads so that the cargo would not fall over. (Tr. 76-77.) Similarly, Khan participated in consolidating loads, a process best described as part loading and part unloading to create a larger single load on one truck. (Tr. 37, 142.) (There was no testimony whatsoever that the load consolidation process required any different type of work on the part of Khan than was described with regard to the ordinary loading and unloading process.) Lastly, during each of his shifts, Khan participated in the loading process for two armored truck vehicles that were non-route trucks, *i.e.*, those that serviced the airport trade. (Tr. 70.) Again, there was absolutely no testimony at trial that would distinguish Khan's involvement in the loading process for these vehicles from that described with regard to the ordinary route truck loading and unloading process.

Notwithstanding the evidentiary consensus regarding the work he performed for IBI, scrupulous review and fine analysis of Khan's personal participation in the movement of cargo onto outbound armored transportation vehicles is still required since this case falls or rises on whether the work actually performed by Khan fits into the definition of "loading" as that term is used in connection with the FLSA's Motor Carrier Exemption. Overall, the evidentiary review shows that the first step in the movement of valuables from the Woodside depot (*i.e.*, that would culminate in the "loading" of cargo onto an outbound truck) was the creation of a manifest that matched the cargo to a particular outbound vehicle. The money room, and not Khan, prepared

---

[5] "Shrink wrapping" is a packaging technique that involves wrapping layers of plastic film around items on a pallet to secure those items to the pallet. (Tr. 76-77, 133.)

the manifest, just as the money room personnel, and not Khan, selected which customers would be assigned to a specific truck. (Tr. 46.) The vault supervisor, and not Khan, would decide how many pallets or skids were to be used and how much cargo was to be loaded on each. (Tr. 75-76.) With respect to the wheeled and palletized cargo packed by Khan, however, Khan decided how such cargo would be placed in the wheeled container or placed and secured on the pallets. (Tr. 76-77.) On the other hand, although Khan loaded outbound cargo into the wheeled trolleys and bins, that very same cargo would be removed from those trolleys and bins and physically loaded into the cargo hold of the truck by the truck's crew, and not Khan. (Tr. 114.) Khan gave clear and unambiguous testimony that he did not place cargo directly onto any of the trucks serviced at Woodside. (Tr. 70-74.)

Indeed, there is no controversy on this foundational point. It is a fact confirmed by Willie Mendez, who testified that vault attendants like Khan did not board the truck to load the cargo removed from the bins and trolleys. (Tr. 99.) Mendez also testified that he, being a supervisor, and the vault attendant, as his assistant, would stand at the back of the truck "handing the shipment to [the truck crew]. There's the one man in the back of the truck grabbing the shipment up by hand and placing it inside the truck." (Tr. 119.) The supervisor and/or vault attendant simply remained on the depot floor with the balance of the shipment to be loaded. (Id.) Mendez testified further that the cargo on the skids, because of its weight and bulk, had to be moved with a pump jack from the vault and adjacent security area to the glass door separating that area from the bay area.[6] However, to get the pallet load from this point onto the outgoing

---

[6] Khan acknowledged that he had used the pump jack in this manner. (Tr. 59, 67.)

11

truck, the use of a forklift was a necessity. (Tr. 120.)

As to this reality, Khan and Mendez have found common ground. It is a reality that is also at the very epicenter of this case. According to Mendez, as vault supervisor it was his responsibility to operate the forklift and physically place the cargo-laden pallets aboard the outbound trucks. (Id.) But, crucially, Mendez also testified that the job description for the vault attendant position included operation of the forklift when exigent circumstances required the supervisor's attention elsewhere. (Tr. 100-01.) Khan professed, nevertheless, that he lacked competence in operating the forklift and never personally operated one to load a truck. (Tr. 37.) This testimony as to Khan's inability to operate a forklift was corroborated by none other than Willie Mendez. (Tr. 96.) Thus, Khan's testimony that he never used the forklift to load cargo onto an IBI truck is not only undisputed, it finds unquestioned support from the testimony of a witness tendered by IBI as one of Khan's supervisors, that is, one of IBI's employees most likely to know of Khan's abilities and deficiencies.[7] Finally, with respect to any other employee of IBI who carried on the pallet loading process from the point where Khan's efforts ended, the evidence is also unequivocal and overwhelming that those employees were not working under either the supervision or control of Khan. (Tr. 163.) In the actual day-to-day operations of IBI at the Woodside depot **during the shift Khan worked**, where or how cargo that Khan handed off to the truck crew was actually placed in a vehicle was solely at the discretion of the truck crew and the loading of pallets onto such vehicles was handled exclusively by the vault supervisor. As to this there is no evidentiary quarrel and the Court so finds as a matter of fact.

---

[7] The only other witness called by IBI also testified that she did not recall Khan ever operating a forklift. (Tr. 148.)

**DISCUSSION OF LAW**

When the evidentiary dross is poured off, the molten mass of IBI's proof must meet the gold standard of the "actual duties" test. The burden to establish factually a statutory exemption from the FLSA never shifts from the employer. See Bilyou, 300 F.3d at 222. More to the point, to avoid the payment of overtime compensation otherwise required by the FLSA, an employer must offer proof of the actual tasks performed by the employee whom the employer seeks to exempt from overtime pay. See Wolfslayer v. Ikon Office Solutions, No. 03-cv-6709, 2004 WL 2536833, at *3 (E.D. Pa. Nov. 8, 2004). In an action brought to compel the payment of overtime compensation, the employer must by a preponderance of the evidence make a clear showing of exemption, for, if by that standard any unclarity remains in the record, the employer will not have satisfied its burden on the affirmative defense and the issue will be resolved in favor of the employee. See Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 209, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966). The practical impact of the rule here is that, since IBI contends Khan's duties included "loading," that his loading duties were safety-related and that they, therefore, fit within the Motor Carrier Exemption to the FLSA, to make out its defense, IBI cannot rest on the duties of its vault attendants generally; its proof must rest on what Khan's duties were specifically.

Caselaw has not been overly enlightening in giving flesh to the bare bones of the term "loader."[8] This is especially true in cases like the one at bar, where the activities of the

---

[8] The Department of Labor has issued an interpretive bulletin, explaining that one acts as a "loader" so long as

he has responsibility when such motor vehicles are being loaded, for exercising

13

employee alleged to be a "loader" are principally confined to a terminal or depot area and do not require the employee to board or ride in a truck. In any event, <u>Levinson</u> and <u>Pyramid</u> require a fact-specific case-by-case inquiry. Hence, to prevail on its affirmative defense, IBI must satisfy its burden under <u>Pyramid</u> by showing that Khan had employment responsibilities and tasks that affected motor vehicle operation safety, that such tasks constituted a substantial part of his ordinary employment activities and were not so "trivial, casual, or occasional" as to be *de minimis*. <u>Troutt</u>, 107 F.3d at 1107-09.[9]

For purposes of analyzing his duties under <u>Pyramid</u>, Khan's employment activities for IBI can be divided into three categories. Allocated by time, the largest single category, about 75% of his time, had not even a remote connection to the loading of an armored truck.[10] This

---

> judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized.

29 C.F.R. § 782.5(a). The Department of Labor, however, has never been delegated any authority to define the scope of the Motor Carrier Exemption; that is now the responsibility of the Secretary of Transportation. See <u>Levinson</u>, 330 U.S. at 676-77. Given the dearth of caselaw addressing "loaders," there is, of course, a temptation to grasp onto any authority that can be found, but the Department of Labor's opinions on this issue are not entitled to any special deference. <u>Troutt</u>, 107 F.3d at 1108 n.1.

[9] Khan acknowledged that, on a couple of occasions during the years of his employment with IBI, he complied with the requests of his supervisors to replace a member of the truck crew on an emergency basis. (Tr. 72-73.) IBI offered absolutely no evidence of what Khan actually did as an emergency replacement worker. This failure of proof dooms any theory of exemption on this ground. Moreover, even assuming he performed ordinary truck crewman work covered by the Motor Carrier Exemption, the undisputed evidence that Khan served as an emergency truck crew member only a couple of times in his entire IBI career would render such conduct *de minimis* under <u>Pyramid</u>. See <u>Troutt</u>, 107 F.3d at 1110.

[10] Though it is obvious to the point of almost being susceptible of proof by judicial notice, the loading or rearrangement of cargo on a truck is obviously related to the safe operation of that vehicle on a highway. The obvious was confirmed by the testimony of Mendez, who specifically described an accident he experienced as the result of the improper stacking of cargo on vehicles of the kind operated by IBI. (Tr. 94-95.) Khan does not seriously contest this point; in fact, he does not contest it at all. The Court finds this fact established beyond a shadow of a doubt. Therefore, the Court concludes as it must that, in accord with <u>Levinson</u>, the proper loading of an

category of activity included daily preparation of the depot for the receipt and dispatch of cargo, and the computer check-in of cargo offloaded from armored vehicles entering the depot.

The second category of Khan's employment activities involved the manifesting and assembling of cargo that he would wheel to route trucks for loading and dispatch. The last category of activity involved the preparation of palletized cargo for loading onto vehicles. Since the first category of activity, obviously, has nothing to do with "loading," as described in Levinson, unless IBI can establish that at least one of the other two categories of activity engaged in by Khan qualifies as "loading," given that each comprises a significant part of Khan's overall duties, IBI will not succeed in establishing its affirmative defense.

Upon examination, though, IBI fails to carry its burden with respect to the second category of Khan's regular activities, which, to elaborate, relates to manifesting cargo for dispatch and placing cargo in bins, trolleys, or other wheeled containers prior to the cargo being loaded onto the outbound armored trucks. The testimony of Mendez places an exclamation point on the uncontroverted evidence that Khan (or Mendez for that matter) never physically boarded an armored truck or placed wheeled cargo aboard a truck during the loading process. (Tr. 120.) When this type of cargo was actually loaded onto the vehicles, Khan's lone role was to assist in transferring the cargo from the wheeled containers to the truck crew. Without any help or direction from Khan, the truck crew then loaded the cargo onto the vehicle. Khan's responsibility was to remain off the truck in the bay area, essentially to provide security and accountability for the cargo while it was in the wheeled containers before the containers were

---

IBI armored vehicle directly affects the safe operation of such vehicles on the highway and IBI employees who actually "load" them fall within the Motor Carrier Exemption.

emptied and their cargo transferred by the truck crew onto the truck.

Pyramid, on remand from the Supreme Court, is one of the few decisions focusing on this type of activity. It reflects a detailed fact-sensitive inquiry by District Judge Conger, who found there, in pertinent part of a lengthy fact finding, that:

> When the southbound truck arrived at location for loading, the plaintiffs would place the packages on the tailboard of the truck. What occurred after that is the immediate issue of the case.
>
> It does not appear that the plaintiffs assisted, as a matter of course, in removing the packages from the tailboard and handling them inside the truck . . . . The defendant's witnesses support these conclusions.

Ispass v. Pyramid Motor Freight Corp., 78 F. Supp. 475, 477 (S.D.N.Y. 1948). Judge Conger then reached his ultimate legal conclusion:

> I hold that the plaintiffs [who placed the cargo on the tailboard of these trucks] are not "loaders" [within the Motor Carrier Exemption], in that they do not affect safety of operation by their incidental duties in connection with loading, and therefore are entitled to recover overtime in accordance with the Fair Labor Standards Act.

Id. at 478. As in the Pyramid remand, with respect to the cargo wheeled to the vehicle for loading, Khan had no responsibility whatsoever for placing the cargo onto the truck, distributing the cargo load in the truck, or in any way securing such cargo in the truck for safe transportation. His activities in this second category clearly did not constitute "loading" that would bring him within the regulatory jurisdiction of the Department of Transportation and, thus, exempt him from overtime compensation.

The last category of activity, relating to cargo moved on skids or pallets, presents a closer

16

question. Yet IBI, again, fails in its burden to prove the applicability of the Motor Carrier Exemption by a preponderance of the evidence. Khan certainly had greater responsibility for palletized cargo – he used his own "common sense" to determine how cargo would be placed on each pallet, (Tr. 76.), he determined when to further secure the palletized load with shrink wrap, he applied the shrink wrap himself, and he used a pump jack to move the pallet load from the vault area to the truck loading area in the bay of the depot.[11] Now, of course, the hypothetical IBI vault attendant described by Mendez, and to some extent Trefzer, (Tr. 132-33.), would then stand by as the vault supervisor forklifted the pallets aboard the outbound armored trucks. More critically, the hypothetical IBI vault attendant was also responsible for using the forklift to load the pallets aboard those vehicles when the vault supervisor was unavailable to perform that task. (Tr. 101.)

If Khan's actual duties included this purported responsibility of the hypothetical IBI vault attendant and he had actually loaded or had been actually tasked to stand by to load pallets personally onto outbound trucks, such activity or tasking would assuredly be sufficient to bring him within the Motor Carrier Exemption of the FLSA. See Pemberton v. Suburban Lawn & Garden, Inc., No. 87-cv-2407, 1988 U.S. Dist LEXIS 11005 (D. Kan. Sep. 22, 1988). The evidence, however, points in the exact opposite direction. Khan's testimony that he could not operate the forklift is not only undisputed, but is actually confirmed by the defense witness

---

[11] Khan testified, without contradiction, that he had received no truck safety training. (Tr. 53.) The Court draws no inference from this fact, which equally supports the conclusions that: (a) while safety related, all that was required for Khan to perform his job was the exercise of common sense with no formal safety training needed; or (b) training was not required because safety determinations were made after the palletized cargo left Khan's control and, therefore, were not a function of his job.

Mendez. Focusing, as the Court must, on Khan's actual duties and abilities, any references to the duties performed by a hypothetical IBI vault attendant which were beyond the acknowledged limitations of Khan's talents are to no avail. Indeed, the conclusion is compelling, since IBI kept Khan on the payroll for over two years without requiring him even to acquire the skill necessary to operate a forklift, that operation of a forklift was not one of the responsibilities of his job.

IBI's last hope is that Khan's involvement in preparing pallets for loading in and of itself is sufficient to bring him within the Motor Carrier Exemption. Neither the parties nor the Court have found a precedent squarely addressing this point. Any determination of this issue, with or without the benefit of additional precedent, must be, nonetheless, guided by the Supreme Court's admonition in Pyramid that the mere handling of freight in a transportation depot does not transform some other kind of cargo handling operation into a loading operation for purposes of the Motor Carrier Exemption. Pyramid, 330 U.S. at 708. From the perspective of the objective analysis of his activities that Pyramid requires, the placement by Khan of outbound cargo onto pallets must be viewed as a "packing" rather than a "loading" operation. What Khan did is indistinguishable from what any packager of goods does at a factory, warehouse, agricultural field or elsewhere in preparing goods for transport by pallet or skid. IBI, to be sure, offers no proof to distinguish Khan's duties from the duties of any other type of packer who does not physically load what he has packed onto a truck.[12] To be clear, as is the evidence, it was not

---

[12] IBI offers only the sketchiest proof of Khan's use of shrink wrap in the packing of palletized cargo. At best, the proof establishes shrink wrapping as a form of packing, like the use of boxes, crates, ropes, metal bands or any other container or fastener. Generally, all forms of packing are designed to limit the movement of the packed contents, that is, to prevent its falling over or out of the container or receptacle in or on which it has been packed. If shrink wrapping a pallet bears a greater relationship to truck transportation safety than, for example, placing goods in a box, IBI fails in such proof.

Khan who would take the packaged (*i.e.*, palletized) goods and decide where and how such palletized cargo would be placed on the truck to ensure its safe operation. At least on Khan's shift, decisions, determinations, and actions relating to the loading of pallets were made or taken by the vault supervisor without any input from Khan. This clear cleavage in responsibility is critical and dispositive. As a packer, in contradistinction to a loader, Khan was an employee covered by the FLSA who was not exempted from the benefits of its coverage by the provisions of the MCA. Cf. Piceno v. De Jong Bros. Farms, Inc., No. 89-cv-7197, 1991 WL 34709 (N.D. Ill. Mar. 13, 1991). And the Court so finds.

Lastly, absent proof that an employer acted reasonably in failing to comply with its obligations under the FLSA, an aggrieved employee is entitled to double the amount of unpaid overtime wages and the trial court should order such liquidated damages in the sound exercise of its discretion. See, e.g., Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987). Simply put, "[d]ouble damages are the norm, single damages the exception, the burden on the employer." Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986). Here, IBI rested on its ability to defeat basic liability. It offered not a shred of evidence to prove that, if its determination to withhold overtime from Khan was in error, its decision to do so had, pursuant to some outside inquiry, a reasonable basis in law and fact. Having lost on basic liability, IBI is without a safety net to stave off the imposition of double damages, which are thus awarded to Khan as the statute and caselaw require.

## CONCLUSION

Plaintiff Rahaman Khan is entitled to recover on his claim under the Fair Labor

Standards Act and New York State Labor Law for defendant IBI's failure to pay required overtime compensation. The Court makes a single award of $7,744.25 in basic overtime pay, which is to be doubled, pursuant to 29 U.S.C. § 216(b), for a total award of $15,488.50.

The Clerk of the Court is directed to enter Judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
February 22, 2007

/ s / Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge